FILED

2008 Jul-31  PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **DEBBIE WIGGINTON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  3:07-CV-00777-RDP** |
| | } | |
| **MICHAEL J. ASTRUE,** | } | |
| **Commissioner of Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Debbie Wigginton brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of Supplemental Security Income ("SSI") benefits under Title XVI. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed because it is supported by substantial evidence and proper legal standards were applied.

## I.      Procedural History

Plaintiff filed her application for a period of SSI benefits on October 14, 2004, alleging a disability onset date of November 8, 2002. (Tr. 21, 39). Plaintiff's application was denied and she requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 28). ALJ Patrick R. Digby conducted a hearing on October 20, 2006. (Tr. 198-224). In his November 17, 2006 decision, ALJ Digby determined that Plaintiff was not eligible for SSI benefits because she failed to meet the disability requirements of the Act and retained the residual functioning capacity to perform medium work with restrictions. (Tr. 11-18). On February 23, 2007, the Appeals Council denied Plaintiff's

request for review of the ALJ's decision.  (Tr. 4).  The ALJ's decision then became the final decision of the Commissioner, and therefore a proper subject of this court's review.

Plaintiff was born on May 15, 1964 and has completed the eighth grade.  (Tr. 39, 94, 212, 219).  She previously worked as a sewer/fabric layout worker in a sewing factory from 1981 to 1987, when she quit to stay home with her children.  (Tr. 55, 73-76, 90, 203-04).  Plaintiff alleges that she has been unable to engage in substantial gainful activity since November 8, 2002 due to depression, mood swings, diabetes, and neuropathy.  (Tr. 13, 54, 89-90, 101).

Plaintiff was admitted twice by rescue to Eliza Coffee Memorial Hospital ("ECMH") for hypoglycemic episodes prior to her alleged disability onset date of November 8, 2002.  In March 2001, Plaintiff was admitted due to a hypoglycemic episode and a blood sugar reading of 34.  (Tr. 137-45).  She was admitted to the ECMH emergency room again in June 2001 for another hypoglycemic episode with a blood sugar reading of 40.  (Tr. 107-21).  Plaintiff was also admitted to ECMH in April 2001 for sinusitis/bronchitis with abnormal EKG findings (Tr. 122-36), in September 2001 for bilateral knee pain with normal x-ray findings (Tr. 103-06), and in December 2003 for sinusitis (Tr. 146-54).

Plaintiff saw Dr. Ahmed, an endocrinologist, at least nine times from September 2003 to August 2006.  (Tr. 155-61, 187-89).  The records from September 23, 2003 indicate that Plaintiff had been referred to Dr. Ahmed for her diabetes mellitus, which had been diagnosed in 1985. (Tr. 161).  Plaintiff's previous medical history included anemia, with B12 injections for one year; depression/mood swings, with treatment for "4-5 months"; and neuropathy, "burning legs," with treatment for one week.  (*Id.*).  Plaintiff's medications at the time were Neurontin and Celexa.  (*Id.*).

Dr. Ahmed's records from December 2003 to September 2004 characterize Plaintiff's diabetes as "Brittle," and in late September 2004, as "uncontrolled" with "complications," and "Hypoglycemic unawareness." (Tr. 155-57, 159, 160). There are no further records from Dr. Ahmed until March and August 2006, when Plaintiff's diabetes are no longer characterized as "brittle." (Tr. 187-88). These later records reflect that Plaintiff was still taking Celexa, as well as Strattera. (*Id.*).

In December 2004, Plaintiff was examined by Dr. George Evans at the request of the State agency. (Tr. 166-70). Dr. Evans' report indicates Plaintiff's major problem to be diabetic neuropathy with "pains from the knee down that is quite persistent and severe," and further stated that Plaintiff is "not aware of having any neuropathy." (Tr. 166). In addition, the report notes that Plaintiff had frequent urinary tract infections and some swelling problems. (*Id.*). The report also reflects Plaintiff's claims of having labile blood sugars and unpredictable hypoglycemic attacks, with constant pain in the lower extremities which is aggravated by "any prolonged standing, etc." (*Id.*). Dr. Evans found Plaintiff had decreased pinprick sensation to her lower extremities and decreased proprioceptive sensations. (Tr. 167). Dr. Evans concluded that Plaintiff's frequent hypoglycemic attacks "would post a problem if she is to be in any dangerous areas or operating motor vehicle or other type equipment" and that her inability to stand or sit "for any length of time would also affect her ability to work." (*Id.*). He also noted that a higher dose of Neurontin might give her more relief from her neuropathy. (*Id.*).

On July 14, 2004, Plaintiff began seeing Dr. I. Lyman Mitchell, her primary care physician, for neuropathic pain from the "knees down." (Tr. 174). At this time, Dr. Mitchell prescribed Ultracet in addition to Neurontin, and discussed an exercise plan with Plaintiff. (Tr. 175). Dr.

3

Mitchell's specific diagnoses were Diabetes Type I, Peripheral Neuropathy, and "Obesity - BMI 30." (*Id.*). Dr. Mitchell repeatedly evaluated Plaintiff as "stable overall" essentially every time he saw her. (Tr. 172, 173, 192, 194, 195).

During a visit to Dr. Mitchell in January 2005, Plaintiff complained of "significant malaise and fatigue," which Dr. Mitchell noted might be attributed to an increase in Neurontin that he had prescribed to Plaintiff in October. (Tr. 172, 173). Plaintiff also had symptoms of a urinary tract infection. (Tr. 172). In June 2005, Plaintiff reported "feeling pretty good" since the last visit, and Dr. Mitchell's notes include instructions to "continue exercise" and to perform "mental alert exercises." (Tr. 196). Dr. Mitchell's notes also indicate that the Neurontin was managing Plaintiff's neuropathy. (*Id.*). In September 2005, Dr. Mitchell began prescribing Strattera for Plaintiff's attention deficit, but found "no reason" to make any other change in her regimen. (Tr. 195). In December 2005, Dr. Mitchell noted that Plaintiff's prescription Neurontin was "really not working very well" and that her neuropathy had been a "significant problem." (Tr. 194). Dr. Mitchell changed Plaintiff's prescription from Neurontin to Lyrica at this time. (*Id.*).

Plaintiff saw Dr. Mitchell in early March 2006 for a "sick visit," at which time he diagnosed Plaintiff with Sinusitis and Rhinitis and prescribed her Shalog and Noral. (Tr. 193). A week later, Dr. Mitchell re-evaluated Plaintiff's sinus problems and prescribed Avalox, Nasonex, and Allegra D, and continued Plaintiff on her other current medications. (Tr. 192). In June 2006, Plaintiff reported that the Lyrica "may have helped [her neuropathy] some," but she was not currently taking it. (Tr. 191). The most recent medical record, from September 2006, does not contain any specific notes about Plaintiff's condition. (Tr. 197).

4

## II.    ALJ Decision

Determination of disability under the Social Security Act requires a five step analysis.  *See* 20 C.F.R. § 404.1 *et. seq.*  First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities.  Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations. Fourth, the Commissioner determines whether the claimant's residual functioning capacity can meet the physical and mental demands of past work.  The claimant's residual functioning capacity consists of what the claimant can do despite his impairment.  Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work. In making a final determination, the Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and the residual functioning capacity are the same as the criteria listed in the Appendix.  If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will not review the claim any further.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that he can no longer perform his former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted).  Once a claimant shows that he can no longer perform his past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

The ALJ found that Plaintiff has not engaged in substantial gainful activity since November 8, 2002, the alleged onset date of disability. (Tr. 13). The ALJ determined that Plaintiff has a severe combination of impairments of diabetes mellitus, a history of vitamin B-12 anemia, and treatment for attention deficit.   The ALJ found that Plaintiff's impairments, considered alone or in combination, fail to meet or medically equal the criteria of an impairment listed at 20 C.F.R. pt. 404, subpt. P, app. 1 of the Guidelines. (Tr. 14). According to the ALJ, Plaintiff's subjective complaints concerning her impairments and their impact on her ability to work are not fully credible due to the degree of inconsistency with the medical evidence established in the record. (Tr. 16). The ALJ determined that Plaintiff retains the residual functioning capacity  to perform medium exertional work with additional limitations. (Tr. 14, 16). He found that Plaintiff had no past relevant work, as she had not worked in the past fifteen years. (Tr. 17).

The ALJ called a vocational expert to testify who was present throughout the hearing and familiar with Plaintiff's background. (Tr. 217-23). The vocational expert testified that an individual with Plaintiff's limitations could perform jobs which exist in significant numbers in the regional and national economies. (Tr. 220). Based on the vocational experts's testimony, the ALJ found that a significant number of jobs exist in the national economy that Plaintiff is capable of performing and that Plaintiff was not under a disability at any time through the date of decision. (Tr. 18).

## III.    Plaintiff's Arguments for Remand or Reversal

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the expiration of the period for Plaintiff to file objections, reversed, or in the alternative, remanded for further consideration. (Doc. # 12, at 20). Plaintiff asserts that there are three reasons why this court should grant relief sought: (1) the ALJ did not accord proper weight

to the opinions of Dr. Evans; (2) the ALJ's findings regarding the severity of Plaintiff's mental impairments are not supported by substantial evidence; and (3) the ALJ failed to sustain his burden of proving that there are other jobs in the national economy that Plaintiff can perform.

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405 (g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.      Discussion

In light of the legal standards that apply in this case, the court rejects Plaintiff's arguments for remand and/or reversal.  For the reasons outlined below, the court finds that the ALJ relied on substantial evidence and applied the proper legal standards.

### A.      The ALJ Properly Rejected the Opinion of Dr. Evans, Who Examined Plaintiff One Time and Whose Findings Were Contrary to Plaintiff's Medical Record.

Plaintiff's first argument is that Dr. Evans was a treating physician and the ALJ violated the "treating physician rule" by improperly discrediting the opinion of Dr. Evans in favor of a state agency medical consultant's findings. The ALJ gave "little weight" to Dr. Evans' report and "great weight" to the state's residual functioning capacity report, which he found to be more consistent with the totality of Plaintiff's medical record.  (Tr. 16).  The ALJ found that Dr. Evans' opinion regarding Plaintiff's frequent hypoglycemic episodes and her "inability to stand for any length of time" lacked credibility because it was unsubstantiated by any of Dr. Evans' clinical findings, was based on Plaintiff's subjective statements, and was inconsistent with the medical records of Dr. Ahmed and Dr. Mitchell.  (*Id.*).

The opinion of a claimant's treating physician must be accorded substantial weight unless some good reason exists for not doing so.  This is known as the treating physician rule.  *See Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986) (other citations omitted); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  However, the Eleventh Circuit has held that there are some situations when the ALJ can disregard the opinion or reports of a treating physician.  The ALJ can ignore the treating physician's report or give it less weight if the treating physician examined the claimant only once, or if the evidence supports a contrary conclusion or when it is contrary to other

statements or reports of that physician.  *See Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  If an ALJ decides to reject or give less weight to a treating physician's opinion, then he must clearly state his reasons for doing so.  Failure to state his reasons is a reversible error.  *Lewis*, 125 F.3d at 1440 (*citing MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  Where medical evidence of record does not conclusively counter the treating physician's report or opinion and good cause is not shown, the law requires the ALJ to give the treating physician's opinion substantial weight.  *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).

Plaintiff argues that the "treating physician rule" requires the ALJ to place more weight on Dr. Evans' opinion than to that of a non-examining physician such as the state agency medical consultant who completed the residual functioning capacity assessment.  (Doc. # 12, at 9-13).  However, the court finds that the ALJ properly discounted Dr. Evans' opinion as (1) doing so was in accordance with the exceptions to the treating physician rule and (2) substantial evidence exists to support the ALJ's conclusions. First, Dr. Evans was not Plaintiff's treating physician.  Unlike Drs. Mitchell and Ahmed, who have treated Plaintiff repeatedly throughout the relevant time period (starting before she applied for SSI, and continuing until at least as recent as 2006), Dr. Evans performed a single consultative exam on Plaintiff in 2004.  The Eleventh Circuit has explicitly refused to apply the treating physician rule in cases where a doctor examined a claimant on only one occasion.  *Heckler*, 779 F.2d at 623 (11th Cir. 1986); *see also Wainwright v. Comm'r of the SSA*, 2007 U.S. App. LEXIS 5698, at *7 (11th Cir. 2007) (holding that the opinions of a doctor who saw claimant once were "not entitled to any special weight").  Accordingly, the opinion of Dr. Evans is not entitled to the deference accorded a treating physician.

Second, the ALJ properly disregarded Dr. Evans' opinion because it is not supported by his own clinical findings.  Good cause exists for disregarding a treating physician's report when the opinion is contradicted by other notations in his own record.  *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991).  Plaintiff reported to Dr. Evans that she has "pain in the lower extremities all of the time but is aggravated by any prolonged standing" and that she could not sit or stand for more than a couple hours before the pain becomes "unbearable." (Tr. 166).  Under a section of the report entitled "Impression," Dr. Evans noted, "Inability to stand or sit for any length of time would also affect her ability to work." (Tr. 167).  However, Dr. Evans' physical exam of Plaintiff does not support such a conclusion about an inability to stand or sit.  Rather, Dr. Evans' report is overall positive. It states that Plaintiff has "no stasis changes in lower extremities....  Excellent pedal pulses. Good posterior tibial, popliteal and femoral. Has full range of motion of ankles....  Good range of motion of hips....  No problems getting on and off the exam table. Normal gait. Not using any assistive devices.... No motor weakness....  No atrophy of any muscle groups." (*Id.*).  Such positive remarks about a patient's mobility contradict a finding that the patient is in pain to such a degree that she cannot stand.[1]

Dr. Evans' lack of clinical evidence in support of his opinion is also inconsistent with the pain standard applicable in this Circuit.  The ALJ emphasized that Evans' findings do "not appear to be so much his own opinion as some consideration of the symptoms and limitations she reported to him." (Tr. 16).  A claimant may use testimony of pain or other subjective symptoms to establish

---

[1]Plaintiff also argues that the ALJ improperly assumed the role of medical expert in pointing out that "[d]espite having diabetes for almost 20 years by that time, she had no atrophy of any muscle groups." While the court may not agree with the ALJ's statement, it is not reversible error because the ALJ had other grounds for dismissing Dr. Evans' opinion, and any possible error on that ground does not affect the outcome of this case.

disability. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). However, in such a case, the pain standard mandates that a claimant's subjective pain testimony be supported by objective medical evidence in order to be credited.  Specifically, the pain standard requires:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*; *see also* 20 C.F.R. § 416.929 ("Medical signs and laboratory findings must exist that show a medical impairment that could reasonably be expected to produce the symptom alleged.").  Because neither Dr. Evans' report nor any other medical report in the record supports Dr. Evans' opinions, which seem largely to reflect only the self-reported symptoms of Plaintiff, they were properly discounted by the ALJ.   Plaintiff points out that the ALJ did not address Dr. Evans' findings that Plaintiff had "decreased pin prick sensation to lower extremities" and that her reflexes were reduced to "II/IV bilaterally." (*Id.*, Doc. # 12, at 11).  However, this is irrelevant because these findings on their own do not conclusively support Plaintiff's allegations of pain.

Third, the ALJ properly discredited Dr. Evans' opinion because the totality of the medical evidence contradicted his findings. The ALJ must "always consider the medical opinions in [the] case record together with the rest of the relevant evidence." 20 C.F.R. § 404.1527(b).  As the ALJ emphasized, no other medical records support the frequency, severity or duration of Plaintiff's symptoms as reflected in Dr. Evans' opinion.  Dr. Evans reported that Plaintiff "claims her blood sugars are very labile and unfortunately, she frequently gets hypoglycemic attacks that she cannot predict... [S]he claims she becomes disoriented and frequently passes out." However, the record reflects exactly two debilitating hypoglycemic attacks, one in March and the other in June 2001. (Tr.

137-45, 107-21). Nothing in the records of either of Plaintiff's treating physicians mentions that she experienced any other hypoglycemic episode.  Two recorded attacks in a three year span of medical records–indeed, records obtained from two different doctors and a hospital–cannot be considered frequent.  The ALJ pointed out that while Plaintiff's diabetes is not "optimally controlled," and that her blood sugar levels vary, Plaintiff "has not reported to [Dr. Ahmed] that [the hypoglycemic spells] happen even weekly, or that they require her to lie down during the day." (Tr. 15).  Accordingly, Dr. Evans' report of "frequent hypoglemic episodes" was properly rejected by the ALJ.

Dr. Ahmed's records from 2003 and 2004 characterize Plaintiff's diabetes as "brittle" and "uncontrolled."  (Tr. 155-57, 159).  However, in the most recent records from March and August 2006, Dr. Ahmed no longer characterizes her diabetes as brittle.  (Tr. 187-88). Nothing from either of Plaintiff's doctors corroborates her claims of intense pain that makes prolonged sitting or standing "unbearable."   In June 2005, Dr. Mitchell reported that Neurontin was managing Plaintiff's neuropathy. (Tr. 196).  In December 2005, when Dr. Mitchell reported the drug was no longer working well, he switched Plaintiff's medication to Lyrica.  (Tr. 194).  In March 2006, no ongoing problems with neuropathy were mentioned.  (Tr. 192, 193).  In June, Plaintiff had taken herself off Lyrica, reporting that it might have helped, but by August she was back on Neurontin.  (Tr. 187, 191). Drs. Ahmed and Mitchell both suggested even as late as June 2005 that Plaintiff exercise, which discredits the idea that she was in too much pain to sit or stand.  (Tr. 157, 175, 196).  It is also doubtful that Plaintiff's anemia is the source of pain or fatigue, as the record makes only one reference to undue fatigue and Dr. Mitchell reported that it was likely due to her Neurontin dosage. (Tr. 172).   It was reasonable for the ALJ to infer that the lack of hospitalizations and minimal

12

change in treatment from Plaintiff's doctors suggests that her condition was "under better and perhaps even good control." (Tr. 15).

The ALJ properly concluded that "there is no indication in the records of significant ongoing symptoms that would have limited the claimant substantially in the ability to sit, walk, stand, lift or perform other work-related activities." (Tr. 15-16). Because no objective medical evidence exists anywhere in the record to support Dr. Evans' opinion, and he only saw Plaintiff once, the ALJ was within his discretion to disregard Dr. Evans' opinion. The ALJ clearly stated his reasons for rejecting Dr. Evans' opinion and there is substantial evidence to support his conclusion. The ALJ did not consider the state agency consultant's opinion taken alone, but found that it was consistent with the totality of the medical evidence. Therefore, the ALJ properly complied with the treating physician rule and did not err by disregarding Dr. Evans' opinion.

**B.**     **The ALJ's Findings Regarding the Severity of Plaintiff's Mental Impairments Are Supported by Substantial Evidence.**

Plaintiff's second argument is that the ALJ's findings regarding her mental impairments are based on mistakes of fact and therefore not supported by substantial evidence. Plaintiff alleges disability in part due to attention deficit, depression, and mood swings. She testified that she has mood swings three to four times a month which make her want to be alone and not talk to others. (Tr. 209). However, the ALJ found that Plaintiff has at most "mild mental limitations." (Tr. 13, 14). The ALJ based this conclusion on the  lack of a diagnosis of any mental disorder and the lack of consistently reported symptoms in the medical records.

Plaintiff bears the burden of putting forth evidence that she is disabled by one or more severe impairments. *See Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983); *see also* 20 C.F.R. §

416.912(a).  A severe mental impairment is an impairment which significantly limits a claimant's mental ability to perform basic work activities.  20 C.F.R. § 416.920(c). Examples of basic work activities include: (1) understanding, carrying out, and remembering simple instructions; (2) use of judgment; (3) responding appropriately to supervision, co-workers and usual work situations; and (4) dealing with changes in a routine setting.  20 C.F.R. § 416.921(b). The mental impairment must also be severe for a continuous period of at least twelve months.  20 C.F.R. §§ 416.905(a), 416.909, 416.920(a)(4)(ii); *Barnhart v. Walton*, 535 U.S. 212, 217 (2002).

Substantial evidence supports the ALJ's determination that Plaintiff's mental impairments are not severe.  The ALJ reasonably concluded that Plaintiff's claims of symptoms of serious mental impairments lacked credibility because she did not report them to her treating physicians. *See, e.g.*, *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (holding that the ALJ's determination that side effects from medication did not present a significant problem was proper where the claimant did not complain about side effects nor did the record disclose any concerns about side effects by the doctors examining the claimant). According to Plaintiff, it was improper for the ALJ to look for a description of a mental impairment in Dr. Mitchell's records because it was Dr. Ahmed, not Dr. Mitchell, who treated Plaintiff for depression and mood swings. While Dr. Ahmed's records starting in September 2003 do consistently record that Plaintiff was taking Celexa, a serotonin uptake inhibitor, none of his reports mention that Plaintiff was experiencing any mental problems. (Tr. 155-61, 187-88).  Accordingly, Plaintiff is in error when she asserts that Dr. Ahmed "specifically diagnosed" her depression and mood swings on her initial visit to him on September 23, 2003; rather, the conditions merely appear in a list of "PMH," or past medical history.  (Doc. # 12, at 14; Tr. 161).

14

Plaintiff indicated multiple times that Dr. Ahmed was treating her for diabetes and Dr. Mitchell was treating her for mood swings, depression, neuropathy, and anemia/B-12 injections. (Tr. 83, 85, 100, 209).  However, Dr. Mitchell's records do not corroborate Plaintiff's claims of symptoms of mood swings that impact her ability to interact with others.  Dr. Mitchell's record from her initial visit in July 2004 reflects that she was taking Celexa. (Tr. 174).  In January 2005, Dr. Mitchell's notes indicate that Plaintiff reported feeling "significant malaise and fatigue." (Tr. 172).  Rather than investigating a possibility of depression, Dr. Mitchell suggested that Plaintiff's Neurontin, which she takes to treat her neuropathy, "may be the source of her problems." (*Id.*).  In June 2005, Plaintiff reported an increase in memory loss, for which Dr. Mitchell merely recommended "mental alert exercises," and further Plaintiff still reported "feeling pretty good overall." (Tr. 196).  In September 2005, Dr. Mitchell reports that Plaintiff "in general has had some problems with attention deficit," and he began prescribing Strattera. (Tr. 195).  By December 2005, Dr. Mitchell reported that Plaintiff was "doing better" with regards to her attention deficit since she was on Strattera, and there is no further mention of Strattera or attention deficit in the record. (Tr. 194).  No other diagnosis or symptoms of depression, mood swings or other serious mental impairments appear in any of Dr. Mitchell's notes, which discredits Plaintiff's claims of a severe mental impairment.[2]

Plaintiff also contends that the ALJ erred in finding that the evidence was not conclusive about whether Plaintiff was currently taking Celexa. However, the court agrees with Defendant that

---

[2]Though the court agrees with the ALJ that the opinion of Dr. Evans is not entitled to much weight, it is worth noting that Plaintiff did not report to him any mental problems, and while he concluded that Plaintiff "might benefit from [a] tricyclic antidepressant," he recommended the drug for its pain relieving benefits, not for treating depression. (Tr. 16).

this argument is irrelevant because the lack of documented symptoms of serious mental health problems implies that any impairments were controlled by medication. Mental impairments which are controlled by medication are not disabling. *See, e.g.*, *Bunch v. Heckler*, 778 F.2d 396, 400 (7th Cir. 1985) (schizophrenia controlled by medication and treatment was nonsevere). As the ALJ noted, nothing in the record suggests that Plaintiff sought mental health treatment by a mental health professional or was hospitalized for a mental impairment at any point. Further, Plaintiff told a disability specialist in January 2005 that the Celexa was merely taken to help her sleep, and that there were no severe mental issues to be resolved. (Tr. 59). It was reasonable for the ALJ to conclude from these facts, in combination with the minimal records of poor mental health symptoms from Plaintiff's treating physicians, that Plaintiff's mental impairments were not severe and that they were controlled by medication. Accordingly, there is substantial evidence to support the ALJ's finding that Plaintiff has no severe mental impairments.

### C.   The ALJ Properly Found That There is Work in the National Economy That Plaintiff Can Perform.

Lastly, Plaintiff argues that the ALJ did not sustain his burden of proving that there is work in the national economy that Plaintiff can perform. Plaintiff objects to the ALJ's conclusion on two grounds. First, she argues that the vocational expert's testimony conflicted with the *Dictionary of Occupational Titles* ("DOT"). Second, she argues that the ALJ's hypothetical question for the vocational expert, upon which the ALJ relied in finding that there is work in the national economy for Plaintiff, was incomplete as a matter of law.

Plaintiff argues that the testimony of the vocational expert regarding jobs someone with Plaintiff's functional limitations could perform is inconsistent with the DOT and that, therefore, his

"entire testimony is tainted." The vocational expert testified that an individual who is limited to frequent fingering could perform work in a wide range of jobs at the medium exertional level, including hand packager, hardware assembler, and self-service laundry dry cleaning attendant. (Tr. 220-22). Plaintiff correctly points out that the DOT specifies, however, that both hand packager and hardware assembler require constant fingering, a higher level than frequent. DOT # 920.587-018 (hand packer requires constant fingering, defined as existing 2/3 or more of the time); DOT # 762.684-046 (hardware assembler requires constant fingering, defined as existing 2/3 or more of the time); *cf.* DOT # 369.677-010 (self-service laundry and dry cleaning attendant requires occasional fingering, defined as existing up to 1/3 of the time). The ALJ asked the vocational expert if his testimony was consistent with the DOT, and the vocational expert responded that it was. (Tr. 223). Plaintiff points to Social Security Ruling 00-4p, *found at* 2000 WL 1898704 (S.S.A. 2000), to support her assertion that when there is an apparent unresolved conflict between the testimony of the vocational expert and the DOT, neither automatically trumps, and the ALJ must resolve the conflict before relying on the vocational expert's testimony. The court agrees that the vocational expert's testimony was not entirely consistent with the DOT, but finds that the ALJ was still entitled to rely on the vocational expert's testimony. The Eleventh Circuit has held that testimony of a vocational expert trumps the DOT when there is a conflict, and that agency rulings such as Social Security Ruling 00-4p do not bind the courts. *Jones v. Apfel*, 190 F.3d 1224, 1229-30 (11th Cir. 1999); *Miller v. Comm'r of Soc. Sec.*, 246 Fed. Appx. 660, 662 (11th Cir. 2007) (confirming the circuit rule that the testimony of a vocational expert trumps the DOT notwithstanding Social Security Ruling 00-4p). Accordingly, the ALJ was entitled to rely on the vocational expert's testimony as support for his finding that work exists for Plaintiff in the national economy.

Further, the inconsistency between the DOT and the vocational expert with regards to the fingering levels of these jobs is irrelevant for the outcome of this case, because Plaintiff has not established that her limitations would preclude her from performing other jobs listed by the vocational expert.  For example, the vocational expert stated that someone restricted to frequent fingering could work as a self-service dry cleaning attendant.  (Tr. 222).  This is consistent with the DOT, which states that this job requires only occasional fingering, defined as "up to 1/3 of the time." DOT # 369.677-010.  Someone restricted to frequent fingering should logically be able to perform a job that requires anything less than frequent fingering, such as the laundry attendant.

Plaintiff next argues that the hypothetical questions posed by the ALJ did not fully describe her functional limitations because they did not include her mental limitations or Dr. Evans' opinion regarding her inability to sit or stand for prolonged periods. When asked whether an individual's need to lie down during the day for periods of one hour or greater would impact her ability to work, the vocational expert responded that "it would preclude the ability to sustain any example of gainful employment."  (Tr. 223).  The vocational expert also testified that any condition that causes an individual to be absent for two or more days a month for a period of nine months or greater would preclude the ability to sustain any kind of unskilled work.  (*Id.*).  Plaintiff argues that these latter two statements properly account for Plaintiff's condition and support a finding that there is no work in the national economy that Plaintiff can perform.

The ALJ is required to question the vocational expert as to the availability of jobs for a person of Plaintiff's age, educational level, work experience, and with the limitations that the ALJ has found her to have. *See Pendley v. Heckler*, 767 F.2d 1561, 1562-63 (11th Cir. 1985); *Johnson v. Harris*, 612 F.2d 993, 998 (5th Cir. 1980).  In order for a vocational expert's testimony to

constitute substantial evidence, an ALJ must pose a hypothetical question which comprises all of the claimant's "severe" impairments. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Brenem v. Harris*, 621 F.2d 688, 690 (11th Cir. 1985); *Pendley*, 767 F.2d at 1562-63 (observing that it cannot be assumed that because a vocational expert was aware of a claimant's "severe" psychological problems, that he took them into consideration in answering hypothetical questions which referred only to physical impairments).   However, where there is a "failure of proof by claimant as to [a particular] element of the hypothetical question," testimony of the vocational expert as to such element becomes irrelevant. *Graham v. Bowen*, 790 F.2d 1572, 1576 (11th Cir. 1986); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). The ALJ is only required to include the restrictions and limitations he recognizes. *See Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

In this case, the ALJ posed the following assumptions to be considered by the vocational expert in identifying jobs for which Plaintiff could perform:

> Hypothetical individuals can perform medium work as defined by the Social Security Administration, meaning occasionally lift and/or carry, including upward pulling of 50 pounds, frequent lift and/or carrying, including upward pulling of 25 pounds, can stand and/or walk with normal breaks for a total of about six hours in an eight hour work day, can sit with normal breaks for a total of about six hours in an eight hour work day. Avoid concentrated exposures to extreme cold, extreme heat, hypothetical individual is to avoid all hazardous machinery and unprotected heights. Hypothetical individuals should perform no commercial driving and avoid uneven terrain. If we assume the hypothetical Mr. Elliott, could you offer an opinion where the hypothetical individual could perform work in the region or the national economy?

(Tr. 219-20).  The vocational expert responded that there was a "wide range of unskilled medium exertional level work" that someone meeting the hypothetical could perform, such as hardware assembler, hand packager, store stocker and self-service laundry dry cleaning attendant. (*Id.*). The ALJ then posed a second question, in which the hypothetical individual could sit for one hour at a

19

time for up to four hours in an eight hour day, could stand for one hour at a time for up to four hours, and could walk for two hours in an eight hour day.  The vocational expert responded that such an individual could perform the same jobs he mentioned for the first hypothetical with the exception of store stocker.  (Tr. 221).  The vocational expert then answered the ALJ's next questions, which added fingering limitations to the second hypothetical's sit/stand limitations, and gave examples of jobs such an individual could perform.  (Tr. 222).

The ALJ's questions encompassed all of the limitations recognized by the ALJ. The ALJ did not have to include an inability to sit or stand, a need to lie down during the day, or Plaintiff's mental impairments, as the ALJ did not recognize these conditions as severe impairments. The vocational expert testified that work existed in the national and regional economies in significant numbers that Plaintiff could perform.  (Tr. 219-22).  The ALJ properly relied on the vocational expert's answers to his hypotheticals when determining that Plaintiff could perform jobs that exist in significant numbers in the national economy.

**VII.    Conclusion**

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination.  The

Commissioner's final decision is therefore due to be affirmed, and a separate order in accordance with the memorandum of decision will be entered.

      **DONE** and **ORDERED** this \_\_\_\_\_31st\_\_\_\_\_ day of July, 2008.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE